UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO: 5:02CV-252-R

WAL JUICE BAR, INC. d/b/a                                          PLAINTIFF
The Cat West

v.

THE CITY OF OAK GROVE, KENTUCKY, et al.                    DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court upon the Motion of the Plaintiff Wal Juice Bar, Inc. d/b/a

The Cat West ("Wal Juice") for Summary Judgment (Docket #57).  The Defendants responded

(Docket #59) and the Plaintiff replied (Docket #61).  This matter is ripe for adjudication.  For the

following reasons, the Plaintiff's Motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

From the mid-1980s to the present day, Wal Juice has operated The Cat West in the

City of Oak Grove as an adult club featuring live, semi-nude, and nude and dance performances.

The operation of the club has been governed, since September of 1998, by Oak Grove's

Ordinance no. 1998-7, (as amended, hereinafter "Ordinance") which regulates "sexually oriented

businesses."  That ordinance was amended in June 2000 by Ordinance no. 2000-11.  The Cat

West is operated under a license, the conditions for which are prescribed by the Ordinance.

Like many cities, the City of Oak Grove passed the Ordinance, after considering reports

and studies conducted around the country, with the intent of controlling the generally recognized

adverse secondary effects of concentrations of adult entertainment businesses.  The Ordinance

states that the City Council of the City of Oak Grove "finds that there is convincing documented

evidenced that Sexually Oriented Businesses, because of their very nature, have a deleterious

effect on both the existing businesses around them and the surrounding residential areas adjacent to them, causing increased crime and the consequent downgrading of property values." Therefore, the City, pursuant to Chapters 82 and 100 and of the Kentucky Revised Statutes, passed the Ordinance "in order to protect and preserve the health, safety and welfare of the patrons of such businesses as well as the citizens of the City of Oak Grove."

This case arises out of a number of arrests which occurred on July 12, 2002, at The Cat West.  Specifically, law enforcement officers arrested the manager and four other people at The Cat West on suspicion of various drug and weapons related offenses.  On July 19, 2002, pursuant to subsection 3.10 of the Ordinance, which governs the procedures for suspension and revocation of licenses, Defendant Colleen Ochs, the Oak Grove City Clerk, sent a letter entitled Suspension and Revocation of Sexually Oriented Business License to Ann Martin ("Martin"), owner of Wal Juice Bar, Inc.

Subsection 3.08 of the Ordinance outlines suspension procedures and provides, in relevant part:

A.  The City Clerk shall suspend a license for a period not to exceed sixty (60) days if he/she determines that the licensee or an employee of a licensee has, subsequent to the issuance of the license:

2. Been charged with a violation of any statute, ordinance, or other law pertaining to the possession, use, or consumption of alcoholic beverages or any other controlled substance while on the business premises during business hours...

Subsection 3.09 of the Ordinance outlines revocation procedures and provides, in relevant part:

A.  The City Clerk shall revoke a license if he/she determines that:

3.  A licensee or an employee has knowingly allowed the unlawful possession, use, or sale of alcoholic beverages or controlled substances on the premises.

2

The letter informed Martin that the City was aware of the July 12 drug raid conducted at The Cat West, and as a consequence the City intended to suspend The Cat West's sexually oriented businesses license for a violation of subsection 3.08(A)(2 and intended to revoke the license as a result of a violation of subsection 3.09(A)(3).  The letter also informed Martin that Wal Juice was entitled to a hearing conducted by the City Clerk.  Wal Juice responded with a letter denying that the suspension or revocation was appropriate, as allowed by subsection 3.10(A).  However, the administrative hearing provided for in subsection 3.10 was never held.

On September 20, 2002, Wal Juice Bar and the Individual Plaintiffs brought suit against the City of Oak Grove, Jean Levell, Mayor of the City of Oak Grove, in her official capacity, and Colleen Ochs, Oak Grove City Clerk, in her official capacity.  In September of 2004, the Plaintiffs filed an Amended Complaint, seeking a declaratory judgment as to the constitutionality of the Ordinance as well as a preliminary and permanent injunction preventing the City of Oak Grove and its officers from enforcing the Ordinance.

Both parties moved for summary judgement, and in considering the motions, Senior Judge Johnstone divided the Plaintiffs' claims into four categories: (1) claims related to the initial application process, (2) the claim related to the annual renewal process (i.e., the claim that the $1000 fee was excessive), (3) claims related to the suspension of the license following drug arrests on the premises, and (4) claims related to revocation of the license following fact finding.

On September 28, 2004, Senior Judge Johnstone denied the Plaintiffs' motion and denied in part and granted in part the Defendants' motion.  Judge Johstone held that the individual plaintiffs lacked standing to assert the claims made in the Amended Complaint.  Judge Johnstone dismissed the claims regarding the initial application process, holding that Wal Juice lacked

standing to bring a claim regarding the initial application process because it had not suffered injury and was not threatened with injury in connection with the process.

Judge Johnstone declined to rule on Wal Juice's allegation that the $1000 annual license fee was exorbitant and set at that level in order to discourage legitimate First Amendment expression, because it appeared to be a matter of factual dispute explored in discovery but not presented to the Court.

Judge Johnstone also found that Wal Juice failed to exhaust its administrative remedies with respect to its claims that the suspension and revocation processes were unconstitutional; i.e., it had not attended the hearing conducted by the City Clerk and thus was precluded from obtaining a judicial remedy.  Thus, the court disposed of all of Wal Juice's claims except the issue of whether the license fee was excessive.

The case was then transferred to this Court and on September 22, 2005, the Court denied the remainder of the Defendants' motion for summary judgment, holding that the license fee was unconstitutional and enjoining the enforcement of the license fee provision in the Ordinance, subsection 3.04.

The Court then entered an agreed final order making Senior Judge Johnstone's September 28, 2004, order of partial summary judgment and this Court's September 22, 2005, order denying the Defendants' motion for summary judgment and enjoining the Defendants from enforcing the license free provision final and appealable, allowing either party to appeal those rulings.

In November of 2005, Wal Juice filed a Notice of Appeal, appealing the partial grant of the Defendants' motion for summary judgment.  Specifically, Wal Juice contended that the Court

should have permitted its First Amendment challenge to the Ordinance.  The Defendants asserted that the Court correctly granted, in part, its motion for summary judgment on the grounds that the Plaintiff had not exhausted its administrative remedies.  The dismissal of the individual plaintiffs was not appealed; thus, the only remaining Plaintiff in this action is Wal Juice.

The Sixth Circuit Court of Appeals declined to reach the merits of the case and held that the Court erred in imposing an exhaustion prerequisite to filing suit in district court.  The Sixth Circuit reasoned that because the hearing was cancelled and never held, Wal Juice was not afforded an administrative remedy, and therefore had no duty to exhaust.  Further, the court said, "the exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to §1983."  *Patsy v. Bd of Regents of State of Fla.*, 457 U.S. 496, 516 (1982).

As this Court originally held that Wal Juice failed to exhaust its administrative remedies, the Court has never addressed Wal Juice's arguments regarding the constitutionality of the Ordinance, strict liability imposed upon business owners, unreasonable inspections, and whether the City Clerk could act as a fair and impartial hearing officer.  Wal Juice has now filed a second motion for summary judgment seeking resolution of these arguments.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences

5

against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

## I.  First Amendment: The Ordinance as a Regulation on Protected Expression

With its renewed motion for summary judgment, the Plaintiff has not raised specific arguments regarding the City of Oak Grove's authority to regulate the type of expressive conduct that takes place at The Cat West.  Unlike many similar ordinances, the Oak Grove Ordinance does not places restrictions on the conduct of licensees and their employees such as the amount and type of clothing nude and semi-nude dancers must wear, the distance such performers must stand from patrons while performing, or the types of performances they may give.  Instead, the Ordinance focuses almost entirely on the requirements to obtain and maintain a license and the

conditions under which a license may be suspended or revoked.  Thus, this Ordinance actually places fewer restrictions on the speech of sexually oriented business licensees than the myriad of similar ordinances that have been challenged and considered across the country.

However, in its amended complaint, the Plaintiffs asks this Court to declare the Ordinance as a whole unconstitutional because it violates the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and Sections 1, 2, 3, 8, and 10 of the Kentucky Constitution.

Therefore, the Court believes that an analysis of the City of Oak Grove's authority under the First Amendment to maintain the sexually-oriented business Ordinance is a necessary starting point in its consideration of the Ordinance as a whole, and the analysis will place the attacks the Plaintiff does make on specific provisions in a better context.  In addition, as shown below, the Plaintiff does argue that one specific section of the Ordinance is so vague and overbroad that it may be enforced arbitrarily and thus chill protected expression.

**A.  Sexually Oriented Speech and Content-Neutral Regulation**

While sexually oriented speech is protected by the First Amendment, a city may adopt content-neutral licensing measures to regulate sexually oriented businesses so long as the measures are designed to serve a substantial governmental interest.  *Ky. Rest. Concepts, Inc. v. City of Louisville*, 209 F. Supp. 2d 672, 677-78 (W.D. Ky. 2002) (citing *Barnes v. Glen Theatre*, 501 U.S. 560, 581 (1991).  In the findings section of the Ordinance, the City makes it clear that its intent is to control or limit the adverse secondary effects of sexually oriented business activity, and it cites multiple studies conducted in urban centers which link such activity to crime and neighborhood deterioration.  The Sixth Circuit has concluded that sexually oriented business

ordinances passed with the intent to control or limit the adverse secondary effects of adult entertainment activity "should be analyzed under the test conceived in *United States v. O'Brien*, 391 U.S. 367 (1968), for content-neutral restrictions on expressive conduct," and do not need to withstand strict scrutiny. *Ky. Rest*, 209 F.Supp.2d at 678 (citing *Deja Vu of Nashville*, 274 F.3d at 391; *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 410 (6th Cir. 1997)). Here, the Plaintiff has not challenged the City's interest in passing the Ordinance, and the Court will respect and accept the City's interest in controlling "the believed secondary effects of adult entertainment establishments." *Id.*

> Content-neutral regulations are analyzed under a four-prong test as set forth in *O'Brien*:
>
> (1) A government regulation is sufficiently justified if it is within the constitutional power of the Government;
>
> (2) if it furthers an important or substantial governmental interest;
>
> (3) if the governmental interest is unrelated to the suppression of free expression; and
>
> (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* (quoting *O'Brien*, 391 U.S. at 377).

Neither an argument that Oak Grove has no constitutional power to enact the Ordinance nor an argument that the City has no authority to control the "secondary effects" of sexually oriented businesses would be availing. "[W]here a state or local government perceives that adult entertainment establishments 'contribute to the blighting or downgrading of the surrounding neighborhood . . . the purpose of preventing the deterioration of commercial neighborhoods [is] certainly within the concept of the public welfare that defines the limits of the police power.'" *Id.* at 679 (quoting *Young v. American Mini Theatres, Inc*., 427 U.S. 50, 74-75 (1976) (plurality

opinion) (Powell, J., concurring in the judgment) (quotation marks, citation omitted)).  Further,
"preventing crime, limiting risks to health and safety and averting the deterioration of
neighborhoods are important municipal interests."  *Id.*

Further, there is no evidence that Oak Grove's true purpose in passing the Ordinance was
to unlawfully suppress expression and not to control the perceived adverse secondary effects of
sexually oriented businesses.  Thus, it appears that the City meets the first three prongs of the
*O'Brien* test.

Therefore, this leaves only the fourth prong of the test and the question of whether the
incidental restrictions on the Plaintiff's alleged First Amendment freedoms are greater than is
essential to the furtherance of the City's interest in controlling the alleged secondary effects of
sexually oriented businesses.  *O'Brien*, 391 U.S. at 377.  The Supreme Court has clarified that
under this prong, "the government's regulation 'need not be the least restrictive or least intrusive
means of doing so,' and that it is valid 'so long as the means chosen are not substantially broader
than necessary to achieve the government's interest..."  *Ky. Rest.*, 209 F.Supp.2d at 680 (quoting
*Ward v. Rock Against Racism*, 491 U.S. 781, 798-800 (1989)) (quotation marks, citations
omitted)).

"Municipalities have broad authority to enact wise and unwise laws, so long as those
laws do not offend the Constitution."  *Id.* at 682.  While the Plaintiff has asserted that the
Ordinance is unconstitutional, it has not pointed to any part of the Ordinance that goes too far in
regulating its business or that does not further the City's asserted interest in controlling the
secondary effects of sexually oriented businesses.  *See, e.g., Ky. Rest*, 209 F. Supp.2d at 680-82
(finding that the plaintiffs' challenge to a three-foot buffer zone restriction failed under the

9

fourth *O'Brien* prong  because such a distance would not significantly diminish the expression of eroticism or intimacy).

## B.  Subsection 3.08(A)(4): Overbreadth and Vagueness

The Plaintiff does not argue that the Ordinance's substantive provisions as a whole should be voided because they are vague and overbroad, but it does specifically attack subsection 3.08(A)(4), which is a portion of the suspension subsection in the licensing section of the Ordinance, as impermissibly vague and overbroad.

Laws so vague that "a person of ordinary intelligence cannot reasonably interpret what is prohibited...should be voided."  *Ky. Rest*, 209 F.Supp.2d at 682 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Laws are overbroad if, in their reach, they prohibit constitutionally protected conduct.  *Id.* (citing *Grayned*, 408 U.S. at 114).  "Where a law has few objective criteria for measurement, or has very broad language, public officials could enforce it arbitrarily, and chill protected expression."  *Id.* (citing *Grayned*, 408 U.S. at 108-09).

Subsection 3.08(A)(4) states:

A. The City Clerk shall suspend a license for a period not to exceed (60) days if he/she determines that the licensee or an employee of a licensee has, subsequent to the issuance of the license:

4. Altered the activities or character of the business such that the business offers, provides, displays, or exhibits goods, services or entertainment not offered, provided, displayed, or exhibited at the time the license was issued, and not otherwise authorized by the license.

The Plaintiff argues this section is overbroad and vague because "a literal translation of this section would mean that any goods, services, or entertainment being offered by the business, even those with no relationship whatsoever to any type of sexual activity or sexual stimulation, would be grounds for suspension of the license, as long as they were not being offered at the time the license

10

was issued."

The Defendants argue that the provision is not overbroad or vague and clearly provides that the phrase "not otherwise authorized by the license" means that suspension of the license would only be appropriate if the licensee began offering goods or services "strictly prohibited" by the license. Offering new good or services not strictly prohibited by the license would not be cause for suspension.

Neither interpretation appears manifestly correct to the Court.  It is hard to imagine that the City would go so far as authorizing the City Clerk to suspend a license if a licensee decided to start selling logo merchandise or switch to a different brand of soft drink than the brand offered when the license was issued.  Further, if the City's intention with 3.08(A)(4) was to make offering goods or services strictly prohibited by the terms of the license grounds for suspension, it is difficult to understand why the City did not make its intention plain.

In *Kentucky Restaurant Concepts*, the City of Louisville survived the plaintiffs' vagueness challenge to the buffer-zone provision in the city's adult entertainment ordinance because the Director of the City Department of Inspections "testified at a hearing about the intended enforcement of the buffer-zone provision." *Ky. Rest*, 209 F.Supp.2d at 682.  In doing so, the Director's testimony established "a sufficiently specific standard to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Id.* at 683 (quoting *Grayned*, 408 U.S. at 108).  The standards articulated by the Director provided "law enforcement authorities the guidance necessary to prevent arbitrary and discriminatory enforcement, and are not so uncertain as to chill activity protected by the First Amendment by 'leading citizens to steer far wider of the unlawful zone' than necessary." *Id.* (quoting *Grayned*, 408 U.S. at 109).

11

The City of Louisville also survived the plaintiffs' overbreadth challenge to the ordinance. The Plaintiffs argued that the buffer-zone provision was overbroad because it could be read "as applying to incidental and general social touching in a way impermissible under First Amendment jurisprudence." *Id.* The court agreed that this was possible, but for the Department of Inspections "to do so would require an interpretation entirely inconsistent with the obvious purpose of the Ordinance, which is to limit touching between entertainers and others during any erotic dance performance." *Id.*

A court has a duty "to give effect to the manifest intention of the enacting legislature." *Id.* "'The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. In such cases, the intention of the drafters, rather than the strict language, controls.'" *Id.* (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (quotation marks, citations omitted)).

The *Kentucky Restaurant Concepts* court declined to "contort the Ordinance 'to conjure up a hypothetical constitutional clash where none actually exists.'" *Id.* (quoting *Eubanks v. Stengel*, 28 F. Supp. 2d 1024, 1036 (W.D. Ky. 1998)).  It is a  "tenet of First Amendment law" that if a statute is "readily susceptible to a narrowing construction that would make it constitutional, it will be upheld." *Id.* (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).  However, the court cannot rewrite a law or ordinance so that it conforms to constitutional requirements. *Am. Booksellers*, 484 U.S. at 397.

Thus, using this principle, the court found that the Department of Inspections' interpretation of the buffer-zone provision, as stated in the Director's testimony, was reasonable in light of the City's intent in passing the ordinance and the actual text of the ordinance. *Id.*  The court went on

12

to warn that should the City of Louisville "ever enforce the Ordinance in a way that infringes upon constitutional rights, Plaintiffs and others would have cause for an as-applied challenge." *Id.* However, as it was, the Plaintiff failed to show that the buffer-zone provision facially violated the Constitution. *Id.*

There is no doubt that subsection 3.08(A)(4) could have been written better.  It is nearly impossible to ascertain its plain meaning upon multiple readings.  In the Court's view, it is much easier to read the phrase "not otherwise authorized by the license" to mean that the licensee may only offer goods and services specifically listed and 'authorized' by the license.  However, this interpretation would imply that licensees cannot alter the non-adult entertainment aspects of their businesses without facing suspension, and such an interpretation would therefore "encompass 'a range of expression that does not cause the secondary effects that the Ordinance was aimed to prevent,'" rendering it overbroad.  *Top Flight, Inc. v. City of Inkster*, 2007 U.S. Dist. LEXIS 12892, at *26 (E.D. Mich. Feb. 27, 2007) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 388 (6th Cir. 2001).

It takes a much greater leap of reasoning to read the phrase as informing licensees that they face suspension if they begin to offer goods and services "strictly prohibited" by the license, even though such an interpretation is a more reasonable requirement given the purpose of the Ordinance. However, unlike *Kentucky Restaurant Concepts*, there has been no testimony as to the meaning of subsection 3.08(A)(4) or any other authoritative interpretation.

The language of subsection 3.08(A)(4) is ambiguous enough as to render it susceptible ro multiple interpretations.  For this reason, the Court finds that subsection 3.08(A)(4) must be voided for vagueness, and its enforcement must be enjoined.  The City is, of course, free to amend the

13

subsection and remedy the constitutional defect.  As the Court has found 3.08(A)(4) void for vagueness, it need not address the Plaintiff's overbreadth argument.

## II.  The Licensing Procedures

In this Motion for Summary Judgment, the Plaintiff also specifically attacks only four other provisions of the Ordinance as constitutionally infirm.  The four provisions are all located in Section III, which specifically outlines the procedures for obtaining, maintaining, suspending, and revoking sexually oriented business licenses. The specific provisions are addressed in greater detail below, as the Court considers the Plaintiff's challenges separately.

The Plaintiff argues: (1) subsections 3.08(A)(2) and 3.09(A)(3) impermissibly impose strict liability on licensees; (2) subsection 3.10(A), which sets forth the procedures for suspension and revocation, violates due process because those procedures are not fair; and (3) subsection 3.06 violates the Fourth Amendment right against warrantless searches and seizures.

### A.  Subsections 3.08(A)(2) and 3.09(A)(3): Strict Liability

The Plaintiff argues that the Ordinance is unconstitutional because it imposes strict liability upon sexually oriented business licensees.  Specifically, the Plaintiff argues that the Ordinance impermissibly "imputes awareness of knowledge of activities of employees to the business owners/licensees without an independent showing of knowledge." The Plaintiff points to subsection 3.08, Suspension, and subsection 3.09, Revocation, as the sections that impose strict liability.

In *Bright Lights v. City of Newport*, the United States District Court for the Eastern District of Kentucky held that a section of the City of Newport Adult Entertainment Ordinance was unconstitutional because it offended due process by imposing strict liability on licensees for the illicit actions carried out by employees or independent contractors on the licensees' premises.

14

*Bright Lights*, 830 F. Supp. 378, 387 (E.D. Ky. 1993).  The contested section of the Newport ordinance read:

> (a) Any license issued under this section may, with notice to the holder thereof and a hearing as hereinafter provided for, be revoked or suspended by the Board of Commissioners:

> (1) If, within twelve (12) months prior to the date on which charges are filed, there has been a **conviction of any licensee or his agent, servants or employees** for any action or activity **occurring in, on or at the premises covered by the license** in violation of any provision of this division or any other ordinance of the city of Newport, or of any criminal or penal statute of the Commonwealth of Kentucky against gambling, disorderly conduct or any other criminal or penal offense, and a judgment of conviction in any court of competent jurisdiction shall be conclusive evidence of such violation[.]

*Id.* at 386 (emphasis added).

This section of the Newport ordinance is similar to subection 3.08(A)(2) of the Oak Grove Ordinance, which states:

> A.  The City Clerk shall suspend a license for a period not to exceed sixty (60) days if he/she determines that the **licensee or an employee of a licensee** has, subsequent to the issuance of the license:

> 2. Been **charged** with a violation of any statute, ordinance, or other law pertaining to the possession, use, or consumption of alcoholic beverages or any other controlled substance **while on the business premises** during business hours... (emphasis added)

Like the Newport ordinance, the Ordinance imposes liability on licensees for acts of their employees on the business premises, whether the licensee knew about such activity or not.  For example, if an employee is caught selling drugs to another employee or customer on the premises, while the licensee is not on the premises and/or has no knowledge of the transaction, the ordinance provides that the license shall be suspended for no more than sixty days.

In some respects, the contested section of the Newport ordinance was harsher than the suspension section of the Oak Grove Ordinance.  The Newport ordinance did not separate the suspension and revocation functions, and allowed for the Board of Commissioners to chose to do

either if an employee was convicted for taking part in certain activities, even without the licensee's knowledge. *Bright Lights*, 830 F. Supp. at 386.   In contrast, the Newport ordinance was also more forgiving than the Oak Grove Ordinance, because it provided that the license could only be suspended or revoked once the licensee or an employee was actually *convicted* of one of the enumerated offenses, while the Oak Grove Ordinance provides for suspension upon mere *charges*, whether founded or unfounded. *Id.*  However, these differences do not alter the applicability of the *Bright Lights* strict liability discussion to the Ordinance here.

The *Bright Lights* court adopted position of an unpublished Sixth Circuit opinion, *Lee v. City of Newport*, No. 91-5158, 947 F.2d 945 (Table) (6th Cir. Nov. 5, 1991). *Bright Lights*, 830 F. Supp. at 387.  In *Lee*, the Sixth Circuit Court of Appeals held that the city could not revoke or suspend the plaintiff's occupational license pursuant to an ordinance that did not require the application of a presumption of knowledge to obtain a revocation. *Id.*  The city did not make a sufficient showing that the plaintiff's fitness to operate her business "was affected by the conviction of any of her employees for acts of prostitution or other relevant criminal conduct committed on the premises." *Id.* (quoting *Lee*, 947 F.2d 945).

As a further example, in *Millennium Rests. Group, Inc. v. City of Dallas*, 191 F.Supp.2d 802, 808 (N. D. Tex. 2002), the Plaintiff adult cabaret challenged the revocation of its sexually oriented business license by the City of Dallas.  The city's sexually oriented business ordinance provided that the police chief had the power to revoke a license if:

> On two or more occasions within a 12-month period, a person or persons committed an offense occurring in or on the licensed premises of a crime listed [in a section defining public lewdness as an actionable offense] for which a conviction has been obtained, and the person or persons were employees of the sexually oriented business at the time the offenses were committed.

16

*Millennium*, 191 F.Supp.2d at 805.

The city argued that its revocation provision was "a system of justified punishment under a theory of respondeat superior" and asserted that licensees should be held strictly liable through that theory because the ordinance violations were public welfare crimes. *Id.* at 808.  In support, the city cited instances of criminal liability based on respondeat superior. *Id.*  The court rejected the city's contentions, noted it could find not an instance where respondeat superior had been applied in the context the city urged, explained that the revocation did not involve criminal sanctions, and "declined to create new law that would hold license holders liable under a theory of respondeat superior." *Id.* at 809.

Here, subsection 3.08(A)(2) of the Ordinance permits the suspension of sexually oriented business licenses without any showing that the licensee had any control over the charged conduct of employees or that the licensee willfully ignored prohibited activities or otherwise knew of, should have known of, or condoned violation of "any statute, ordinance, or other law pertaining to the possession, use, or consumption of alcoholic beverages or any other controlled substance" on the part of employees.  This provision, as it stands, offends due process.

Further, subsection 3.09(A)(3) of the Ordinance provides:

A.  The City Clerk shall revoke a license if he/she determines that:

3.  A **licensee or an employee** has **knowingly allowed** the unlawful possession, use, or sale of alcoholic beverages or controlled substances on the premises.

While it appears at first glance that this section contains the knowledge standard so lacking in the suspension section, it actually does not, because it allows the Clerk to revoke a license if he or she determines that *an employee* has knowingly allowed the unlawful possession, use, or sale of alcoholic beverages or controlled substances on the premises.  However, the application of the

17

knowledge standard does depend on the employee in question.

For example, if while the licensee is not on the premises, an employee whose knowledge cannot be imputed to the business itself, such as a waitress, turns a blind eye to drug use or a drug sale in the establishment, the licensee may find that his or her license to operate has been revoked. However, there are situations where the knowledge of an employee such as a supervisor or general manager could properly be imputed to the licensee under subsection 3.09(A)(3).

However, because subsection 3.09(A)(3) does not differentiate among the types of employees whose knowledge may be imputed to an unaware licensee, it still imposes strict liability on the licensee and permits the revocation of sexually oriented business licenses without any showing that the licensee had any control over the conduct of an employee who "knowingly allowed the unlawful possession, use, or sale of alcoholic beverages or controlled substances on the premises." This provision, as it stands, offends due process

For these reasons, the Court finds subsection 3.09(A)(2) and subsection 3.09(A)(3) unconstitutional, but only to the extent that these provisions allow the City Clerk to (1) under 3.09(A)(2), suspend a licensee because an employee has been charged with "a violation of any statute, ordinance, or other law pertaining to the possession, use, or consumption of alcoholic beverages or any other controlled substance while on the business premises during business hours" and (2) under 3.09(A)(3), revoke a license because an employee without any type of supervisory authority has "knowingly allowed the unlawful possession, use, or sale of alcoholic beverages or controlled substances on the premises."

**B.  Subsection 3.10(A): Due Process**

The Plaintiff argues that subsection 3.10(A) of the Ordinance violates due process because

18

(1) it provides that City Clerk shall act as the administrative hearing officer, and (2) it does not provide for a fair hearing.  Subsection 3.10(A) reads:

> If the City Clerk determines that probable grounds exist for denial, suspension, or revocation of a license under this ordinance, the City Clerk shall notify the applicant or licensee (respondent) in writing of the intent to deny, suspend, or revoke the license, including the grounds therefore by personal delivery or by certified mail.  The notification shall be directed to the most current business address on file with the City Clerk. Within ten (10) days of receipt of such notice, the licensee may provide to the City Clerk in writing a response which shall include a statement of reasons why the license or permit should not be denied, suspended, or revoked.  Within ten (10) working days of the receipt of such written response, the City Clerk shall conduct a hearing which the licensee shall have the opportunity to present evidence and witnesses on his or her behalf.  The Clerk shall notify the licensee in writing of the hearing date within 3 days of the receipt of such written response.  If a response is not received by the City Clerk in the time stated, or if after the hearing, the City Clerk finds that grounds exist for a denial, suspension, or revocation of a license, then such action shall become final and notice of such final action shall be sent to the licensee. Such notice shall include a statement advising the licensee of the right to appeal such decision to a court of competent jurisdiction.  If the City Clerk finds that no grounds exist for denial, suspension, or revocation of a license, then the City Clerk shall withdraw the intent to deny, suspend, or revoke the license and shall so notify the licensee in writing by delivery or by certified mail of such things.

## 1.  City Clerk as Hearing Officer

The Plaintiff argues that the Ordinance is unconstitutional because its combines investigative and adjudicative functions in the City Clerk, which "exacerbates the potential for arbitrary enforcement of the ordinance."  Under the Ordinance, the City Clerk is responsible for investigating whether an Ordinance provision has been violated, conducting an administrative hearing on the suspension or revocation if one is requested, and ultimately deciding whether to suspend or revoke the license.

It is true that a "fair trial in a fair tribunal is a basic requirement of due process," and this principle applies to administrative hearings as well as to court proceedings.  *Withrow v. Larkin*, 421 U.S. 35, 36 (1975).  However, "the combination of investigative and adjudicative functions

19

does not, without more, constitute a due process violation..." *Id.* at 58.  Yet this does not

"preclude a court from determining from the special facts and circumstances present in the case

before it that the risk of unfairness is intolerably high." *Id.*  Thus, when a challenge is made to

impartiality of a judge, or tribunal, or hearing officer, the Plaintiff must set forth, and the Court

may consider, the special facts and circumstances surrounding the combination of investigative

and adjudicative functions that make the risk of unfairness intolerably high. *See id.*

The Plaintiff has argued, very minimally, that because the Ordinance's "Findings"

section emphasizes the City's belief that sexually oriented businesses have "objectionable

effects," such as requiring special supervision from public safety agencies (Finding 3),

deleterious effects on existing businesses and residential areas causing increased crime and

downgraded property values (Finding 4), declines in neighborhoods and neighborhood oriented

commercial, religious, and institutional facilities (Finding 6), and contributions to urban blight

and downgrading the quality of life (Finding 9), the City Clerk could not possibly be fair and

impartial.  The Plaintiff argues that because the Clerk brings the charges against the licensee, he

or she must certainly have an interest in seeing the charge confirmed, because through the

Ordinance, the City and its officials have clearly expressed an opinion regarding the value of

sexually oriented businesses.

However, this is not enough.  The Plaintiff's general belief that the Clerk is not impartial

does not prove that the Clerk has actual bias toward sexually oriented business licensees that

would affect the outcome of suspension or revocation hearings.

The Plaintiff has pled no special facts or circumstances which make the risk of unfairness

intolerably high.  Nor has the Plaintiff provided evidence that it was treated unfairly.  Here, the

20

City Clerk acted as an investigator, because she learned of the arrests that took place at The Cast West and sent the suspension and revocation letter.  However, the Clerk never exercised her adjudicative functions because the administrative hearing provided for in 3.10(A) was never held.

It is far from reasonable or fair to presume, without any evidence, that the City Clerk would not provide this licensee or any others a fair hearing.  The Plaintiff's argument that subsection 3.10(A) is unconstitutional because of the risk of unfairness embodied in the combination of investigative and adjudicative functions in the City Clerk is unsupported and tenuous, and the argument must fail.

### 2. Fair Hearing

The Plaintiff also argues that the Ordinance violates due process rights because the actual hearing process is not fair to licensees facing suspension or revocation.

#### a. Hearing Timetable

The Plaintiff first argues that the timetable for the hearing, as set forth in subsection 3.10(A), is not fair.  The Ordinance provides that a license may be suspended or revoked based upon the conduct of a licensee as well as that of an employee.[1]  According to the Plaintiff, the Ordinance allows the City Clerk to hold a suspension or revocation hearing based upon the conduct of the licensee or an employee, and render a final decision, before guilt has even been determined.

Subsection 3.10(A) provides that once the Clerk sends a written notice of the intent to

---

[1]However, as previously stated, to the extent that the Ordinance holds licensees strictly liable for the acts of employees, it is unconstitutional.

deny, suspend, or revoke a license, the licensee has ten days from receipt within which to provide a statement of reasons why the license should not be denied, suspended, or revoked. Within ten working days of the Clerk's receipt of the licensee's statement of reasons, the Clerk "shall" conduct a hearing in which "the licensee shall have the opportunity to present evidence and witnesses on his or her behalf." Thus, within twenty days, at most, of receipt of a notice to suspend or revoke, the Clerk will render a decision regarding suspension or revocation. It is very unlikely that any criminal charges would be resolved in this time, and it is always possible that such charges would be dropped or that the accused would adjudicated not guilty.

In response, the Defendants argue that subsection 3.10 is designed to provide the prompt administrative action that is necessary due to the concern over secondary effects that form the core of the Ordinance. In their view, it would be inappropriate to delay administrative action while a criminal trial dragged on for months or years.

The Defendants also point to subsection 3.10(B), which the Plaintiff ignores. Subsection 3.10(B) explicitly states that when the City Clerk makes a final decision to deny, suspend, or revoke a license, the licensee has thirty days from the date of delivery of notice to appeal to a court of competent jurisdiction. If the licensee decides to appeal, the subsection provides any suspension or revocation decision made by the Clerk will not take effect until a final decision is rendered in the appeal. The Court interprets this to mean that during the thirty day period in which the licensee may make an decision regarding appeal, the Court will not suspend or revoke the license until the time for appeal has run and the City will take not action to close the licensee's business. Only once the licensee chooses to file an appeal, or the thirty-day period has run without action by the licensee, may the suspension or revocation be enforced.

22

Once the licensee files an appeal, subsection 3.10(B) provides that the licensee shall be granted a temporary license to operate pending a final decision on appeal.  The Cat West has continued to operate under such a temporary license since this action was filed over five years ago.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Here, the Ordinance provides licensees with the opportunity for a hearing before the City Clerk where they may present evidence and witnesses on their behalf.  Licensees also have thirty days within which to appeal adverse decisions to a court of competent jurisdiction, where they will have the full panoply of judicial resources available to them.  Until the conclusion of the appeal, licensees may continue to operate their businesses under temporary licenses.  Thus, the Ordinance does not deprive licensees of any property interest until they have had the opportunity to be heard before a court "at a meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333.

### b.  Subpoena Power

The Plaintiff next argues that the Ordinance violates due process because while licensees have the opportunity to present evidence and witnesses on their behalf at the subsection 3.10 hearing before the City Clerk, they cannot compel witnesses to testify at the hearing by subpoena.  The Plaintiff asserts this is unfair because as a license may be revoked due to the alleged acts of an employee, the licensee may not have any access to evidence for his or her defense.  Further, the Plaintiff argues, if the employee is facing criminal charges, he or she cannot be compelled to testify against himself or herself.

23

In response, the Defendants argue that the subsection 3.10 administrative hearing is not conducted by a court of law with the authority of state police power at its control; therefore, the City Clerk cannot compel witnesses and ensure their attendance.  The Clerk must necessarily place the burden of witness-attendance on the licensee.  The Defendants also assert that as 3.10(A) provides for prompt judicial review of adverse decisions, a licensee will have an opportunity to call the witnesses he or she wishes to call in that appeal.  Further, they argue, the appeal provides time for any underlying criminal case to be resolved, resolving any issues regarding testimony.

The Court cannot find any Sixth Circuit support for the proposition that a claimant or licensee has an absolute right to subpoena its own witnesses during local administrative proceedings such as license revocation hearings.  However, there is some guidance in cases discussing the subpoena right in federal administrative proceedings and local administrative proceedings similar to the one at hand.  It is certainly not uncommon for an administrative *body* to possess subpoena power.  Yet, the Court can find no instance where a claimant before such a body has been adjudged entitled to *absolute* or *independent* subpoena power.

In federal social security proceedings, claimants must follow a federal regulation which requires them to file a written request stating why a subpoena is necessary and the important facts that the witness is expected to prove.  *Calvin v. Chater*, 73 F.3d 87, 89-90 (6th Cir. 1996) (citing 20 C.F.R. § 416.1450(d)).  Thus, social security claimants are entitled to a subpoena *process*, although they must request the agency to issue a subpoena and provide information as to why the subpoena is necessary.

In that context, the Sixth Circuit Court of Appeals held in *Calvin* that a claimant's request

24

for a subpoena need not be honored if the claimant fails to justify the request in the manner

prescribed by the social security regulation.  *Id.* at 92-93.  In so holding, the court declined to

find that the "right to subpoena witnesses is 'absolute' in the sense that a party who requests a

subpoena is automatically entitled to its issuance whether or not he has complied with the

published rules governing such matters."  *Id.* at 92 (interpreting *Richardson v. Perales*, 402 U.S.

389  (1971)).  Instead, it is reasonable to require the party requesting a subpoena to comply with

the regulation's requirements, and they are not entitled to have a subpoena issued if they

disregard those requirements.  *See id.*

More similar to the case at hand is *Foxy Lady, Inc. v. City of Atlanta*, 347 F.3d 1232

(11th Cir. 2003), where the plaintiff club owners challenged the method by which the City of

Atlanta could revoke liquor licenses pursuant to city ordinances.  *Id.* at 1233.  Specifically, they

argued that the process outlined in the ordinances violated their procedural due process rights as

it provided no absolute or independent right to subpoena witnesses before the city's License

Review Board.  *Id.* at 1236.  However, unlike here, the Atlanta ordinances governing the liquor

license revocation process did provide a subpoena process to licensees.  *Id.* at 1235.  Instead of

granting licensees an independent power to subpoena witnesses, the ordinances required the

plaintiffs to request that the *mayor* issue a subpoena to compel a witness to appear before the

License Review Board.  *Id.*

In reviewing the subpoena process that was provided, the Eleventh Circuit Court of

Appeals held "that procedural due process...does not require an *absolute* or *independent* right to

subpoena witnesses in administrative hearings."  *Id.* at 1237 (emphasis added).  The court held

the requirement that parties request the mayor to issue a subpoena provided "a constitutionally

adequate process for the revocation of a liquor license," and constituted "an acceptable balance between the need to conduct a fair hearing and the City's legitimate desire to place reasonable limitations on the content and duration of its liquor license revocation hearings." *Id.* at 1236, 1237.

In fact, the *Foxy Lady* court actually decided that it was logical for the mayor's office to control the issuance of subpoenas in order to keep the license revocation process from becoming "cumbersome and potentially unmanageable." *Id.* at 1238. The court stated that if the plaintiffs "were to have their own, absolute or independent subpoena power, they effectively could stop, or at the very least delay significantly, the entire revocation process by issuing subpoenas to potentially hundreds of individuals." *Id.* The court went on, stating, "[i]n the hopes of frustrating the City's efforts, the Clubs could subpoena witnesses ranging from club regulars to testify that they have never seen any dancer commit one of the enumerated violations to the dancer's parents who may testify that their child is unlikely to do such things." *Id.*

In the Seventh Circuit case *Amundsen v. Chicago Park Dist*, the plaintiff challenged his inability to subpoena witnesses to his employment termination hearing before the Chicago Park District's Personnel Board. 218 F.3d 712, 715-717 (7th Cir. 2000) However, Illinois law actually allowed an employee challenging his or her discharge to "request that the Personnel Board or one of its hearing officer issue a subpoena for witnesses," although the plaintiff never issued a request. *Id.* at 717 (citing 70 ILCS 1505/16a(c)(2), the Illinois statute authorizing the creation of a personnel board and providing that it may subpoena witnesses). Nonetheless, the court said that in the administrative hearing context, it had held that "the ability to subpoena witnesses is not an absolute right." *Id.* (citing *Butera v. Apfel*, 173 F.3d 1049, 1058-59 (7th Cir.

26

1999); *DeLong v. Hampton*, 422 F.2d 21, 24-25 (3d Cir. 1970); *Henley v. United States*, 379 F. Supp. 1044, 1048 (M.D. Pa. 1974). Instead, the court held that "'in administrative matters, due process is satisfied when the party concerned is provided an opportunity to be heard in an orderly proceeding which is adapted to the nature and circumstances of the dispute.'" *Id.* (quoting *Obasi v. Dep't of Prof'l Regulation* 266 Ill. App. 3d 693, 639 N.E.2d 1318, 1325, 203 Ill. Dec. 499 (Ill. App. Ct. 1994).

Given all of this, the Court cannot conclude that subsection 3.10(A) violates due process because it does not provide licensees an independent right to subpoena witnesses to the hearing before the City Clerk. However, sexually oriented business licensees are entitled to a fair hearing when faced with suspension and/or revocation of their license to do business. The Court believes that in this context, the due process requirement a fair hearing requires the Ordinance to provide some type of subpoena process to licensees. To the extent that subsection 3.10(A) does not provide such a process, it offends due process.

The Court does not presume to prescribe the exact type of process that would be adequate here and it will not order a certain process to be incorporated into the Ordinance. The Plaintiff is free to renew its challenge to subsection 3.10(A) should the process the City chooses to employ prove constitutionally inadequate, keeping in mind that it is not entitled to an absolute or independent right to subpoena witnesses.

However, until such time as a subpoena process is put into place, the Court must enjoin enforcement of subsection 3.10 of the Ordinance in its entirety. Although the Court has found that the provisions enabling the City Clerk to act as the hearing officer and setting forth the hearing timetable do not offend due process, these provisions mean nothing if licensees do not

27

receive a fair hearing due to the lack of a subpoena process.

### C. Subsection 3.06: Inspections and Investigations

Subsection 3.06 of the Ordinance sets forth the City's inspection and investigation policy

for sexually oriented business licensees.  It states:

> A. It shall be an offense for any person to interfere with a lawful inspection of the premises by a representative of any law enforcement agency, County Health Department, Fire Department, the Building Official or the City Clerk at any time it is occupied or open for business.

> B. By accepting a license to operate a Sexually Oriented Business, the holder consents that a peace officer, fire marshall, building official or health inspector may enter the licensed premises **at any time such premises are open for business** to conduct an inspection or investigation for the purpose of evaluating compliance with this ordinance.

> 1. In conducting inspections as provided herein, officers shall limit their investigations to detecting violations of the regulatory provisions of this ordinance and the Kentucky Revised Statutes.

> 2. This subsection does not in any way limit the authority of an officer to conduct any search authorized by a warrant, or pursuant to any exception to the warrant requirement.

The Plaintiff argues that this subsection is unconstitutional because by requiring it to

consent to inspections at any time the premises are open for business, the subsection violates its

Fourth Amendment right against warrantless searches and imposes an unconstitutional condition

upon the exercise of its First Amendment rights.

In *Kentucky Restaurant Concepts*, the court enjoined enforcement of the City of

Louisville's sexually oriented business ordinance in part because its inspections scheme

infringed on the licensees' Fourth Amendment right against warrantless searches, therefore

imposing "an unconstitutional condition upon the exercise of their First Amendment rights." *Ky.

Rest.*, 209 F. Supp. 2d at 691.  The contested language in the Louisville ordinance read:

[A]pplication for or granting of a license according to this section is deemed to permit periodic inspections of the public areas of any establishment requiring a license under this subchapter for the purpose of verifying compliance with the terms and conditions of this subchapter.

The City of Louisville argued that the inspections provision was permissible because the "periodic inspections" were "limited in place and scope" and extended only to the "public areas" of an establishment. *Id.* The City asserted that its ordinance was modeled upon a regulatory scheme of Metropolitan Nashville that has been upheld. *Id.* In *Ellwest Stereo Theater, Inc. v. Boner*, 718 F. Supp. 1553 (M.D. Tenn. 1989), the plaintiffs argued that the inspections provision of the ordinance was unconstitutional because it did not require a warrant and constituted an unreasonable search and seizure. *Ellwest*, 718 F. Supp. at 1577. The ordinance provided for unlimited inspections by the Health Department, Metro Police Department, Codes Administration, Fire Marshal or other persons, at reasonable times. *Id.*

The *Ellwest* court rejected the plaintiffs' contention because the Fourth Amendment does not require a warrant for inspections of the portions of commercial premises that are "open to and observable by the public." *Id.* (citing *Marshall v. Barlow's* Inc., 436 U.S. 307, 315 (1978)). The court held that to the extent the "unlimited inspections" were "limited to the part of the premises open to the public," the inspections provision did not violate the Fourth Amendment. *Id.*

The City of Louisville inspections provision contained a "public areas" limitation, but the *Kentucky Restaurant Concepts* court seized upon the "reasonable times" limitation in the Metropolitan Nashville ordinance and held that as written, the Louisville ordinance impinged upon Fourth Amendment rights because it contained no "reasonable times" limitation upon the time of searches. *Id.* Further, the City had not corrected its omission of a time limitation and

had not "issued any interpretive regulations limiting inspections to business hours." *Id.*  The

court refused to presume that the City would enforce the ordinance in a constitutional manner.

*Id.* (adopting the reasoning of *J.L. Spoons, Inc. v. City of Brunswick*, 49 F. Supp. 2d 1032, 1040

(N.D. Ohio 1999)).  The court concluded that the potential Fourth Amendment implications

would be removed if the City inserted the phrase "at reasonable times" into the provision.  *Id.*

In *J.L. Spoons, Inc. v. City of Brunswick*, 49 F. Supp. 2d 1032 (N.D. Ohio 1999), the

inspections provision of the sexually oriented business ordinance of the City of Brunswick

provided:

> An applicant or licensee shall permit representatives of the Police Department, County
> Health Department, Fire Department, Zoning Department or other City departments or
> agencies to inspect the premises of a sexually oriented business for the purpose of
> insuring compliance with the law, at any time it is occupied or open for business.

*J.L. Spoons,* 49 F. Supp. 2d at 1039.  The ordinance also made failure to permit such inspections

a first degree misdemeanor, resulting in the suspension of the license.  *Id.* at 1040.

In granting the plaintiff's motion for a preliminary injunction, the court stated that

administrative searches of both homes and commercial premises generally require "a suitably

restricted search warrant."  *Id.* (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978);

quoting *Camara v. Mun. Court of the City and County of San Francisco*, 387 U.S. 523, 539

(1967)).  The court noted that "there is a narrow exception to the warrant requirement for

administrative searches conducted in 'closely regulated' industries," but "sexually oriented

businesses do not qualify as highly regulated industries."  *Id.* (citing *New York v. Burger*, 482

U.S. 691, 700-01 (1987) (finding vehicle dismantling businesses to be highly regulated, like

mining and firearms industries)).  The court postulated that because sexually oriented businesses

are protected by the First Amendment, "the government probably could not 'closely regulate'

30

them under the *Burger* line of cases without running afoul of the First Amendment." *Id.*

Ultimately, the *J.L. Spoons* court decided that even if it were to assume that sexually oriented business were "closely regulated," the ordinance at issue would still fail to meet the criteria for warrantless administrative searches set forth in *Burger*. *Id*. at n.7. The *Burger* Court set forth three criteria for warrantless administrative inspections of closely regulated businesses:

> (1) there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made;
>
> (2) the warrantless inspection must be necessary to further the regulatory scheme; and
>
> (3) the inspection program must act like a warrant, i.e., it must advise the owner of the commercial premises that the search is being made pursuant to law, it must have a properly defined scope, and it must limit the discretion of the inspecting officers.

*Burger*, 482 U.S. 691, 702-03 (internal citations omitted). The *J.L. Spoons* court called the Brunswick ordinance "virtually limitless" and "completely discretionless" and said it "failed to curb the discretion of inspectors in time, place, and scope." *J.L. Spoons*, 49 F. Supp. 2d at 1040, 1040 n.7.

Here, the Ordinance requires those who accept a license to operate a sexually oriented business in Oak Grove to allow peace officers, the fire marshal, building officials, and health inspector to enter the business at any time it is open for business. The "any time it is open for business" restriction is comparable to the "reasonable times" restriction required by the *Kentucky Restaurant Concepts* court. In fact, it is more specific and provides licensees with an exact time frame in which they may be subject an inspection. Therefore, the Court finds that the "any time it is open for business" restriction does not offend the Fourth Amendment.

As noted above, the Fourth Amendment does not require a warrant for inspections of the portions of commercial premises that are open and visible to the public. *Marshall*, 436 U.S. at

31

315.  To the extent that the Ordinance permits warrantless inspections of the public areas of

licensed businesses, it does not offend the Fourth Amendment.  *See Ellwest*, 718 F. Supp. at

1577

However, the Oak Grove Ordinance does not contain an explicit "public areas"

restriction.  Instead, the wording employed in subsection 3.06(B)(1) seems to imply that

inspectors may enter the licensed premises and search, without a warrant, any portion of the

premises they so desire.  The language in subsection 3.06(b)(1) limiting inspections "to detecting

violations of the regulatory provisions of this ordinance and the Kentucky Revised Statutes,"

while certainly limiting the discretion an inspector may employ, does not clearly limit the places

in which the inspector may search.

In *832 Corp. v. Gloucester Twp*., 404 F. Supp. 2d 614 (D.N.J. 2005), the United States

District Court for the District of New Jersey considered a challenge to an inspections provision

much like the one at hand.   Gloucester Township's adult business ordinance permitted

inspectors to enter licensed establishments "at any reasonable time" they were occupied or open

for business, but did not contain a "public areas" restriction.  *Gloucester Twp*., 404 F.Supp.2d at

635.  The plaintiffs argued that this impinged upon the Fourth Amendment because it permitted

warrantless inspections of the non-public areas of their businesses, such as offices.  *Id.*

However, the court decided that the ordinance was not facially invalid, and the issue

should instead be resolved in an "as-applied challenge, where the Court would have evidence of

the actual application of the Ordinance."  *Id.* at 635-36.  The ordinance provided that refusal to

permit a "lawful inspection" was a violation triggering suspension and revocation provisions.

Thus, the court reasoned, a licensee could refuse to permit an "unlawful inspection" without

violating the ordinance, and "a warrantless inspection of the non-public areas of a commercial establishment violates the Fourth Amendment." *Id.* (citing *Marshall*, 436 U.S. at 312. Therefore, the ordinance left room "for a licensee to resist unlawful warrantless inspections without punishment." *Id.* In arriving at this holding, the court distinguished *J.L. Spoons*, as the ordinance there contained no such limiting language and made the refusal to permit an inspection a misdemeanor and grounds for suspension. *Id.* (citing *J.L. Spoons*, 49 F. Supp. 2d at 1039-40).

The Court finds that this is the best approach to be applied here. Subsection 3.06 clearly states that licensees may not interfere with "lawful" inspections. Therefore, it follows that licensees may refuse to permit unlawful inspections. A warrantless inspection is only lawful if it is restricted to the areas of the premises which are open to the public.

Like the *Gloucester Township* court, the Court believes that this issue is better left for an as-applied challenge to the Ordinance. The Plaintiff has not produced any evidence indicating that the City of Oak Grove has applied subsection 3.06 in a manner that offends the Fourth Amendment. Thus, a renewed challenge be appropriate at a later date should the City apply subsection 3.06 in a manner that violates the Fourth Amendment.

## III. Severability

The Court must now decide whether to enjoin enforcement of the entire Ordinance, or merely sever those portions which it has found invalid. Section VII of the Ordinance sets forth a severability clause. It reads:

> If any section or part of any section or paragraph of this ordinance is declared invalid or unconstitutional for any reason, it shell not invalidate or impair the validity, force or effect of any other section or sections or part of a section or paragraph of this ordinance.

"The Supreme Court has held that invalid portions of a statute should be severed unless it

33

is clear that the Legislature would not have enacted those provisions which are constitutional, independent of those provisions which are not." *Plain Dealer Publ'g Co. v. City of Lakewood,* 794 F.2d 1139, 1147 (6th Cir.1986), *aff'd in part and remanded*, 486 U.S. 750 (1988) (citing *INS v. Chadha*, 462 U.S. 919, 931 (1983); *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)). "Moreover, a provision is presumed severable if what remains after severance is fully operative as a law." *Id.* (citing *Chadha*, 462 U.S. at 934).

However, given the Ordinance's constitutional defects, the Court cannot give effect to the severability clause, because by severing the 'hearings' subsection of the Ordinance, subsection 3.10, the Ordinance does not remain fully operative as a law. *See id.* Without subsection 3.10, which provides for license denial, suspension, and revocation hearings and also contains the judicial review provision, enforcement of any remaining part of the Ordinance is impossible. Further, without subsection 3.10, the Ordinance would most certainly offends the due process rights of licensees. The Court believes that the City of Oak Grove would not have passed the Ordinance if it did not contain this provision setting forth the method by which the City Clerk's denial, suspension, and revocation decisions may become final. *See Chadha*, 462 U.S. at 931; *Buckley,* 424 U.S. at 108; *Plain Dealer*, 794 F.2d at 1147.

By enjoining enforcement of the Ordinance, the Court presumes that the City of Oak Grove will allow all business currently operating pursuant to a sexually oriented business license to remain in operation, but will not enforce the Ordinance against any Sexually Oriented Business, as that term is defined by the Ordinance.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is **GRANTED**

**in part** and **DENIED in part**.

The Court finds:

(1) subsection 3.08(A)(4) is void for vagueness;

(2) the portions of subsections 3.09(A)(2) and 3.09(A)(3) imposing strict liability upon the holders of sexually oriented business licenses under the Ordinance are unconstitutional;

(3) subsection 3.10(A) deprives licensees of their due process rights as it does not provide for any type of subpoena process in the administrative hearing before the City Clerk; and

(4) the enforcement of Ordinance as a whole must be enjoined.

An appropriate order shall issue.